UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

DONALD H. MILLER and
MARCIA MILLER,

        NO. CIV. S-06-377 FCD EFB

    Plaintiffs,

  v.                    MEMORANDUM AND ORDER

SOUTHERN PACIFIC RAILROAD;
H.B. FULLER; CELANESE
INTERNATIONAL CORP.; UNION
PACIFIC RAILROAD and DOES 1
through 50, inclusive,

    Defendants.

----oo0oo----

    This matter is before the court on defendant Celanese International Corp.'s ("defendant" or "Celanese")[1] motion for summary judgment of plaintiffs Donald and Marcia Miller's ("plaintiffs") complaint against it, alleging claims for strict

---

[1] Celanese is the sole remaining defendant in this action. (See Stip. & Order for Dismissal, filed April 13, 2007 [dismissing defendant Union Pacific Railroad Company, sued also as Southern Pacific Railroad]; Joint Status Rpt., filed June 26, 2006, at 2:22 [describing that plaintiffs previously dismissed defendant H.B. Fuller]; see also Opp'n, filed July 23, 2007, at 2:10-11 [plaintiffs acknowledge that defendants Southern Pacific Railroad and H.B. Fuller have been dismissed from this action].)

1

products liability, negligence, premises liability and loss of consortium.[2]  Defendant contends it is entitled to summary judgment because said claims are preempted by federal laws regulating the safety and design of railcars.  Alternatively, defendant argues that even if not preempted, plaintiffs' claims fail on the merits, as plaintiffs have no admissible evidence to support one or more of the essential elements of their claims.

Plaintiffs concede, in opposition to the motion, that their products liability claim is preempted by federal law.  (Opp'n, filed July 23, 2007, at 10:16-18 [acknowledging said claim is barred under Carrillo v. ACF Industries, 20 Cal. 4th 1158 (1999)].)  Plaintiffs also concede that they do not have a viable premises liability claim against defendant, who was not the landowner.[3]  (Opp'n at 11:14-21.)  Based on these concessions, the court grants defendants' motion with respect to plaintiffs' products and premises liability claims.[4]

---

[2] Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

[3] According to plaintiffs, they never sought to allege such a claim against defendant; although, their complaint does not make that clear.  (Id. at 11:14-21.)

[4] In their opposition, plaintiffs, *for the first time,* assert that they are also pressing a federal claim under the Federal Safety Appliance Act against defendant. (Id. at 5:1-7; 9:9-10:2.)  However, plaintiffs do not assert this claim in their complaint and never moved to amend their complaint to add such a claim.  Accordingly, the court will not consider such a claim herein.  Pursuant to the Federal Rules of Civil Procedure and this court's Scheduling Order, plaintiffs have not demonstrated "good cause" to permit amendment of the complaint at this late juncture in the case (where discovery is closed, the dispositive motion deadline has passed and trial is set to commence on November 27, 2007).  Fed. R. Civ. P. 16(b); Sched. Order, filed July 7, 2006.

Thus, the only claims at issue are plaintiffs' negligence and loss of consortium claims.[5] For the reasons set forth below, the court finds plaintiffs' negligence claim, like their products liability claim, preempted by federal law. As such, the court does not consider defendant's alternative argument that plaintiffs' negligence claim fails because defendant did not owe plaintiffs a duty, or even if it did, plaintiffs have no evidence defendant breached any duty. Because the court finds plaintiffs' negligence claim preempted, their loss of consortium claim must necessarily be dismissed as well, since this claim cannot stand without a predicate claim of liability.[6]

**BACKGROUND**

Celanese is a manufacturer of industrial chemicals including vinyl acetate monomer ("VAM"). (Def.'s Reply to Pl.'s Resp. to Def.'s Stmt. of Undisp. Facts ["RUF"], filed Aug. 3, 2007, ¶ 1.) In or about 2001, Celanese and H.B. Fuller ("HBF") entered into a contract wherein Celanese agreed to supply HBF with VAM; the product was to be shipped in a Celanese-leased[7] tanker railcar. (RUF ¶ 2.) More specifically, the railcar would be loaded with VAM at a Celanese production facility. The rail line operator, in this case, Union Pacific, would take possession of the tanker railcar and deliver it to the shipment destination. The railcar

---

[5] Plaintiffs' negligence claim is asserted on behalf of Donald Miller, who was injured in the subject accident. The loss of consortium claim is asserted by Marcia Miller, Donald's wife.

[6] See Rodriguez v. Bethlehem Steel Corp., 12 Cal. 3d 382 (1974).

[7] Celanese leases the railcar involved in the instant accident from its subsidiary. (RUF ¶ 3.)

3

1  would be unhooked at a spur line at HBF where it would eventually
2  be offloaded.  (Ex. B to Def.'s Index of Documentary Evid.
3  ["Def.'s Index"], filed June 26, 2007.)

4      The railcar involved in the instant action is CELX 23266
5  (sometimes herein, the "Subject Railcar").  (RUF ¶ 3.)  Celanese
6  did not design the Subject Railcar, and it was manufactured in or
7  about 1980 by North American Car Corp. ("NACC").  (RUF ¶s 4-5.)
8  The railcar's design, specifications and components were approved
9  by the Association of American Railroads ("AAR").  (RUF ¶ 6.)[8]
10 Celanese purchased the Subject Railcar after it was built by NAC
11 and used it exclusively to transport its products since that
12 time.  (RUF ¶ 7.)

13     Plaintiff Donald Miller has been an employee of HBF since
14 approximately 1980/1981.  HBF operates a plant in Roseville,
15 California, where Mr. Miller worked.  (RUF ¶ 8.)  Prior to the
16 incident at issue, Mr. Miller was a Shift Manager on the second
17 shift, in which is typical schedule was 2:00 p.m. to 10:00 p.m.
18 However, on the day of the accident, October 15, 2003, he came to
19 work early during the morning shift and undertook offloading the
20 Subject Railcar.  (RUF ¶ 9.)

21     A tanker railcar can be emptied by using alternate valve
22 systems, one located at the belly of the car or from an operating
23 platform located at the top.  On the day of the accident, HBF

---

[8] Plaintiffs attempt to dispute this fact, arguing that while the railcar's design and specifications may have been approved by the AAR, "the components actually used to assemble the car were not." (Id.)  However, plaintiffs offer no evidence to support this contention, and defendant's submitted evidence establishes the contrary. (See Ex. C to Def.'s Index.) Accordingly, the court treats this fact as undisputed.

4

required its employees to hook a vent hose and pipe to a vent valve located on top of a tanker railcar. A hose is then hooked to a fitting located at the bottom of the tanker railcar. (Ex. I to Def.'s Index [Crandall Dep. 19:7-20:1]; Exs. L, M, N to Def.'s Index [photographs depicting both systems and the assembly on the platform].)[9]

Mr. Miller attempted to utilize HBF procedure to offload the railcar which requires access to the top operating platform of the car. While trying to hook up a hose to the vent valve, plaintiff's pant leg allegedly caught a manway bolt, causing him to fall from the top of the railcar. (RUF ¶ 9.) Mr. Miller claims he suffered a cervical spine injury, which necessitated a fusion surgery, and a closed head injury. (Opp'n at 1:28-2:2.)

As a result, plaintiffs filed a form complaint in superior court against Celanese, among others, asserting claims for products liability, general negligence, premises liability and loss of consortium. (RUF ¶ 12.) Defendant thereafter removed the action to this court on the basis of diversity jurisdiction and now moves for summary judgment. (Not. of Removal, filed Feb. 24, 2006.)

It is Mr. Miller's fall from the Subject Railcar that gives rise to plaintiffs' remaining liability theories (negligence and loss of consortium) against Celanese. Specifically, plaintiffs contend the height of the manway throat and the length of the

---

[9] Exhibit "N" to Defendant's Index depicts the assembly on the platform, including the "hatch," marked "A," which houses the valves of the railcar, the "manway," marked "B," the "manway throat," marked "B-1," the "manway hatch," marked "B-2," and the "manway bolts," marked "B-3."

5

manway bolts employed in combination presented a hazard for which Celanese bears responsibility.  (RUF ¶ 13.)[10]

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56©; see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must be viewed in the light most favorable to the nonmoving party.  See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.

---

[10] Despite their discovery responses to the contrary, plaintiffs state in opposition to the motion that they "do not claim that the [Subject Railcar] lacked a safety chain or swing arm guards."  (Id.)  Accordingly, the court does not consider defendant's arguments regarding these devices (see Mem. of P. & A., filed June 26, 2007, at 8-10), as plaintiffs have abandoned any theory of liability based on such components of the railcar.  At issue on the motion is only whether the height of the manway throat and length of the manway bolts give rise to liability against defendant.

6

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. See Nissan Fire & Marine, 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## ANALYSIS

By their negligence claim, plaintiffs seek to impose liability on defendant for alleged design defects of two features of the operating platform (the walking surface of the railcar). First, they claim the throat of the manway was too high. (RUF ¶ 13.) Second, they claim the manway bolts on the operating platform were too high in relation to the manway cover, ultimately causing Mr. Miller to trip and fall from the railcar. (Id.)

The question presented here is whether such a common law claim of negligence is preempted by federal law. Article VI of the Constitution provides that the laws of the United States shall be the supreme law of the land; as such, any state law that conflicts with federal law is "without effect." See Cipollone v. Liggett Group Inc., 505 U.S. 504, 516 (1992) (*citing* M'Culloch v. Maryland, 17 U.S. 316, 427 (1819)). In evaluating a federal law's preemptive effect, however, the court must proceed from the

7

presumption that the historic police powers of the state are not to be superseded by a federal act "unless that [is] the clear and manifest purpose of Congress." Id. at 516 (*citing* Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

Applying this framework, the United States Supreme Court has identified three circumstances in which state law is preempted by federal law: 1) where Congress explicitly defines the extent to which its enactments preempt state law ("express preemption"); 2) where state law regulates conduct in a field that Congress intended the federal government to exclusively occupy ("field preemption"); and 3) where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ("conflict preemption"). English v. General Electric Co., 496 U.S. 72, 78-80 (1990) (citations omitted).

Congress has specifically addressed the issue of railroad safety and equipment in several statutes, including, among others, the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq.*, and the Federal Safety Appliance Act ("SAA"), 49 U.S.C. § 20301 *et seq.* Congress empowered the Secretary of Administration to implement this body of regulatory law; this obligation was delegated to the Secretary of Transportation, who authorized the Federal Railroad Administration ("FRA"), an operating administration within the Department of Transportation, to assume this responsibility. 49 U.S.C. § 20103; 45 U.S.C. § 431; 49 C.F.R. § 1.49(n). Subsequently, the FRA promulgated a comprehensive regulatory scheme, the Railroad Safety Appliance

Standards ("RSAS"), in the Code of Federal Regulations, that preempt a broad range of state laws. <u>Mehl v. Canadian Pac. Ry.</u>, 417 F. Supp. 2d 1109-13, 1116-20 (D.N.D. 2006). Together, these laws and their implementing regulations create an extensive network of federal railroad regulations.

The question of whether these federal laws preempt state law is a legal question for the court to decide. <u>See</u> <u>City of Auburn v. Qwest Corp.</u>, 260 F.3d 1160, 1172 (9th Cir. 2001). Under FRSA, Congress included an express preemption clause in order to achieve its goal of national uniformity with respect to railroad safety. <u>Donelon v. New Orleans Terminal Co.</u>, 474 F.2d 1108, 1112 (5th Cir. 1973). Section 20106 of FRSA provides:

> Laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order to railroad safety or security when the law, regulation, or order –
> (1) is necessary to eliminate or reduce an essentially local safety or security hazard;
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
> (3) does not unreasonably burden interstate commerce.

Since FRSA has an express preemption clause, a preemption analysis must focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent. <u>CSX Transp. v. Easterwood</u>, 507 U.S. 658, 664 (1993). In that regard, in <u>CSX</u>, the Supreme Court recognized that under Section 20106, state common law claims are preempted when they attempt to regulate a subject matter covered by the federal regulation, unless they are necessary to redress an essentially

local safety hazard.  Id.

The SAA, on the other hand, does not have an explicit preemption provision.[11]  However, courts have consistently held that the SAA "so far occupie[s] the field of legislation relating to the equipment of [rail] cars with safety appliances . . . [that it] supercede[s] existing and prevent[s] further legislation of the subject."  Southern Ry. Co. v. R.R. Comm., Ind., 236 U.S. 439, 447 (1915); see e.g. Jordan v. Sourthern Ry. Co., 970 F.2d 1350, 1352 (4th Cir. 1992).  Thus, the SAA, as interpreted by courts under principles of "field preemption," divests states of all authority to regulate on the devices enumerated therein, whether the regulation is "consistent, complementary, additional or otherwise."  See e.g. Gilvary v. Cuyahoga Valley Ry., 292 U.S. 57, 60-61 (1934).

In this case, whether defined as the safety requirements for working on railcars or as the safety requirements of the walking surface of operating platforms, plaintiffs' negligence claim relating to the manway throat and manway bolts is preempted by the above laws.  Contrary to plaintiffs' argument, to preempt their claim, the federal regulation need only speak to the broader subject matter at issue.

> [A] regulatory framework need not impose bureaucratic micromanagement in order to substantially subsume a particular subject matter . . . the regulations need

---

[11] The SAA was intended to standardize regulations regarding freight/railcar safety devices for the benefit of workers and passengers.  See Illinois Central R.R. Co. v. Williams, 242 U.S. 462, 466-67 (1917).  The SAA mandates that railcars operate with certain safety equipment and features, including couplers, brakes, running boards and handholds.  49 U.S.C. § 20302.

10

>      not set forth in minute detail each action a railroad
>      must take.  Rather, the regulations must substantially
>      subsume a particular subject matter.

In re Derailment Cases, 416 F.3d 787, 794 (8th Cir. 2005).  In Mehl, for example, the court recognized that FRSA's regulations regarding bolt tightness, crack joint bars and restressing clearly intended to prevent claims of negligent construction and maintenance, although the regulations did not prescribe any actual standards for construction and maintenance.  417 F. Supp. 2d at 1116-17.

    Here, federal regulations encompass the design and components of a operating platform of a railcar, the area plaintiff allegedly fell from while attempting to offload the VAM.  For example, the RSAS provides various regulations addressing the operating platform, including, among other things, the requisite dimensions for the platform, the number of ladders required and safety railing.  49 C.F.R. §§ 231.21(j)(1), (j)(2)(vi), (j)(3), (j)(4)(ii).  The RSAS also addresses the walking areas of the operating platform, including bolt specifications, the tread and the distance extending from the railcar.  See generally id. at § 231.1.  These regulations, at times, are highly specific, prescribing such details as the height of the tread on the sill steps, the depth of the sill steps and the bolts that must be used in securing the sill steps.  Id. at § 231.1(d)(3)(iii), (d)(3)(ii), (d)(4).  The RSAS also addresses the manways of a tanker railcar, requiring that the "manway cover must be an approved design."  49 C.F.R. § 179.103-

2(a).[12]  Federal regulations further mandate requirements for manway bolts, including the circumference of the bolts and the general holding capacity of the bolts.  Id. at § 179.100-12.

This level of detail, with which the FRA regulates the operating platforms of tanker railcars (through the RSAS), demonstrates that the walking surface of the platforms, including the manway-bolt ratio and the height of the throat of the manway, is covered by federal regulation leaving no room for state common law theories to regulate the subject.  Similar to Mehl, discussed above, because plaintiffs' negligence claim asserts liability for design components of the railcar which are broadly regulated by federal laws, their state law claim is preempted.  417 F. Supp. 2d at 1112-13 (preempting claims for negligent application of the train's emergency brakes, failure to inspect, and improper movement of defective railcars, among others, because said claims did not "lie beyond the ambit of the FRSA's broad regulatory . . . system"); see also Carrillo, 20 Cal. 4th at 1170 (recognizing that where federal laws, such as the SAA, "touc[h] a field in which the federal interest is so dominant" the federal system of regulation will be "assumed to preclude enforcement of state laws on the same subject").  Carrillo addressed a state law claim for products liability, and plaintiffs concede that their claim here for the same is preempted under Carrillo.  (Opp'n at 10:16-18.) Plaintiffs' negligence claim is based on the very same facts as

---

[12]   In this case, it is undisputed that prior to Celanese's purchase of the Subject Railcar, its design, components and specifications were approved by the AAR, and thus the Subject Railcar was designed and built in accordance with federal regulations.  (RUF § 6.)

12

their products liability claim and is likewise preempted under the reasoning of Carrillo.  Their negligence claim seeks recovery for alleged design defects in components of railcars which are heavily regulated by federal law, as set forth above.  That federal regulation precludes pursuit of state law remedies for such defects, including plaintiffs' instant negligence claim.[13]  See e.g. Gilvary, 292 U.S. at 60-61.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in its entirety.  The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: September 7, 2007

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

[13] Because plaintiffs failed to timely seek leave to assert a claim for relief under any of the above federal laws, the court does not consider the merits of any such claim herein.